## CRAWFORD v. OMAN & STEWART STONE CO.

1.  CONSTRUCTION OF CONTRACT—THE WORD "SHIPPED."—A written contract gave to defendants the exclusive right to a quarry of plaintiff for a term of years, the defendants to pay a specified price for all rock shipped. The only railroad accessible to this quarry belonged to

strangers and private parties. *Held*, that the contract was not so unreasonable as to require the court to extend the defendants' stipulation so as to include rock quarried but not shipped.

2. WRITTEN CONTRACT—TERM OF ART.—Where a written contract called for a specified price for dimension stone shipped, and the evidence showed that Belgian blocks were shipped, but was conflicting as to whether Belgian blocks were dimension stone, it was error to charge the jury that Belgian blocks were not technically dimension stone and to leave it to them to say whether it was used in its strict technical sense in this contract. On the contrary, it should have been only left to the jury to say what was the meaning of this term of art in this contract, as such meaning must control.

Before NORTON, J., Fairfield, February, 1890.

Action by Sarah E. Crawford and Robert Crawford against The Oman & Stewart Stone Company, commenced January 31, 1889. The case turned upon the construction of the following lease:

This agreement, entered into by and between the parties following, witnesseth that Robert Crawford and S. E. Crawford, his wife, both of Township Nine, Fairfield County, and State of South Carolina, have this day leased to the Oman & Stewart Stone Company, a firm doing business in Nashville, Tennessee, with headquarters at Oman, Watson County, Kentucky, the exclusive right and privilege of quarrying granite on the lands owned by said Crawford and wife, in said township, for the term of ten years, with the privilege to the said Oman & Stewart Stone Company of renewal for another five or ten years at their election, on the following conditions and terms, viz.:

The said Oman & Stewart Stone Company are to have the exclusive right of quarrying granite on any part of the lands owned by said Crawford and wife that may appear to said Oman & Stewart Stone Company as proper and advisable.

Said Oman & Stewart Stone Company are to have the right to build such houses, derricks, or other machinery, roads, tramways or railroads, as may seem to them necessary in the operation of the quarry or quarries they may choose to operate. Said Oman & Stewart Stone Company are to have the right of way over the lands of said Crawford and wife for such roads, tramways or railroads as they may choose to make or travel over in conducting their business of quarrying. The right to use and remove any stone quarried or unquarried on the lands of said Crawford and wife in said township is hereby conveyed to said

Oman & Stewart Stone Company. Said company have the further privilege of cutting down and removing or using such timbers as may be on the ground or in the way of hauling granite.

In consideration of the aforementioned privileges to said Oman & Stewart Stone Company, they agree and bind themselves to pay annually to said Crawford and wife one cent and one quarter of one cent for every cubic foot of granite shipped of dimension stones during the first five years of this lease, and one cent and one half of one cent per cubic foot of dimension stones during the second five years and all subsequent terms of this lease.

For all other stones shipped not dimension stones they agree to pay fifty cents per car load.

Any and all improvements erected or made by said company on the lands of said Crawford and wife are to remain the property of said company, and the right is reserved to them to remove them at any time during this lease.

In witness whereof we have affixed our names this 22nd day of December, 1884.

*Messrs. Ragsdale & Ragsdale,* for appellants.

*Mr. H. N. Obear,* contra.

March 13, 1891. The opinion of the court was delivered by

MR. JUSTICE McIVER. On the 22nd of December, 1884, the plaintiffs and defendants entered into a written agreement, styled a lease, a copy of which is set out in the "Case," and should be embraced in the report of this case. By the terms of this agreement the defendants, amongst other things, were to have the exclusive right of quarrying granite on the lands of the plaintiff for the term of ten years, with the privilege to defendants of renewal for another term of five or ten years at their election, in consideration whereof the defendants agreed to pay annually to the plaintiffs "one cent and one quarter of one cent for every cubic foot of granite shipped of dimension stones during the first five years of this lease, and one cent and one half of one cent per cubic foot of dimension stones during the second five years, and all subsequent terms of this lease. For all other stones shipped not dimension stones they agree to pay fifty cents per car load."

The defendants having worked the quarry for some two or three years, abandoned it, whereupon this action was commenced

on the 31st of January, 1889. In the complaint the plaintiff undertook to state two causes of action, the first for breach of the written contract in not paying the price agreed upon for the stones quarried, and the second for damages for ceasing to work the quarry; but as the second cause of action has been practically eliminated by the ruling of the Circuit Judge on the motion for a new trial, to which no exception has been taken by the plaintiffs, we are confined to a consideration of the first cause of action. In support of this cause of action the plaintiffs, after alleging the making of the written contract, substantially as above stated, except that feature which prescribes the price of stone shipped, other than dimension stone, alleges that defendants "have quarried two hundred thousand blocks of granite, known as 'Belgian blocks;' and that said defendants have already shipped one hundred and ten thousand of said Belgian blocks, and they are ready to ship and are preparing to ship the remaining ninety thousand of said blocks." They then proceed to allege that the 200,000 Belgian blocks "so quarried by the defendants are equivalent to thirty-six thousand cubic feet of granite; that said Belgian blocks are 'dimension stone;' and that there is due and payable to the plaintiffs by the defendants, under said agreement, upon the said thirty-six thousand cubic feet of stone the sum of four hundred and fifty dollars," for which sum judgment is demanded.

Testimony was adduced tending to show how much stone had been shipped by the defendants, how much was at the quarry cut into Belgian blocks, but not shipped, and also as to what was the meaning of the term "dimension stone," which seems to be a term of art, as to which there was considerable conflict among the witnesses. The plaintiff, Robert Crawford, who, as agent for his wife, his co-plaintiff, seems to have had entire charge of the business, testified that he regarded Belgian blocks as dimension stone, but there is no testimony that the defendants so regarded them. The Circuit Judge charged the jury that the defendants were liable not only for the stone actually shipped by them, but also for such as had been quarried and left at the quarry, using these words: "Whatever was quarried and ready for shipment may be considered in this contract as articles shipped;" and as to the rate that should be charged for the Belgian blocks, while

they were not "dimension stones," yet if the testimony satisfied the jury that the term "dimension stone" was not used in its ordinary technical sense, but was intended to embrace Belgian blocks, then they could so find and allow the plaintiff to recover for the Belgian blocks at the rate fixed by the contract for dimension stone.

The jury having found a verdict in favor of the plaintiffs for the whole amount claimed—four hundred and fifty dollars—defendants appeal upon the following grounds: "1st. For that his honor erred in charging the jury that if the 75,000 Belgian blocks were quarried, then whatever was quarried and ready for shipment may be considered in this contract as articles shipped, and that the plaintiffs could recover therefor against the defendants. 2nd. In that his honor erred in this: that having charged the jury that the parties being quarrymen, there was a presumption that they contracted with reference to the technical meaning of 'dimension stone,' and having charged further that Belgian blocks were not dimension stone in its technical sense, it was error to submit to the jury the question whether the plaintiff had rebutted this presumption, when he had offered no testimony whatever to rebut the same."

The action being based upon a written contract, it is quite clear that the rights and liabilities of the parties must be determined by the terms of such contract, and it seems to us equally clear that, under the provisions of this contract, the plaintiffs had no right to demand, and the defendants were under no obligation to pay for, any stone until it was shipped or sent to market, for such is the express provision of the contract. It does not provide that defendants shall pay for the stone when it is quarried, or even when it is prepared for market, but only when it is *shipped*. Such being the contract of the parties, expressed in no equivocal terms, we do not see by what authority a court can undertake to change those terms. It may have been, and doubtless was, a very material matter to the defendants that they should not be required to pay until the stone was shipped, as they may have been dependent for the means of paying for the stone upon their sales of the

same, and the proceeds of such sales could scarcely be realized before the stone was shipped.

Again, it is not difficult to understand that one of the material elements which entered into the calculation of the defendants in making a contract in reference to such a heavy and unwieldy article would be the rates of transportation which they might be able to obtain, and hence there might have been a very good reason for inserting in the contract the provision that the defendants were to pay only for the stone shipped. The testimony shows that the defendants were largely dependent for transportation upon a private railroad which, not being under the control of the public authorities of the State, its owners could fix any rates they pleased, and thus effectually destroy the business of the defendants; and in fact there is testimony, from one of the owners of this railroad who was interested in a rival quarry, that the rates of transportation on that railroad were raised for the express purpose of putting an embargo on the business of the defendants, which did have the effect of stopping their operations. In view of this contingency, which the testimony shows must have been known to both parties, it seems to us that the contract as it was written, and as we think it must be construed, so far from being an unreasonable one, was just the reverse, and that the insertion of the provision whereby the defendants were only to pay for the stone shipped was a very prudent and proper precaution in view of the contingency above mentioned, which, as the event proved, did happen; for it can scarcely be supposed that the defendants intended to bind themselves to pay for stone which they could not get to market except by paying such rates of transportation as would effectually destroy the profits of the business, and perhaps bring them in debt every year.

It may be that it was an unwise contract on the part of the plaintiffs to make their pay contingent upon the amount of stone shipped, without first taking measures to secure such rates of transportation as would enable the defendants to carry on the business with reasonable success; but courts do not sit for the purpose of relieving parties from unwise bargains, and when parties of full age and capacity, without fraud or imposition (of which there is no pretence here), enter into a contract, they will

be held to its performance according to the terms inserted in such contract, unless, perhaps, it is so wholly unreasonable and unconscientious as to afford a presumption that the parties must have intended something different from that which the words they used clearly import. But, as we have said, we do not see anything so unreasonable in the terms of this contract as written as would afford any ground for such a presumption.

The suggestion made by the Circuit Judge that the parties could not have contemplated that the defendants should work the quarry from year to year, taking from it blocks of stone of any kind, and become the owners of such blocks without becoming responsible for the payment of the contract price therefor, and hence that whatever stone was quarried and ready for shipment may be considered under this contract as shipped, and consequently that if there were, as estimated, 75,000 Belgian blocks left at the quarry, the defendants were liable to pay the contract price for the same, cannot be approved. In the first place, we do not think that it necessarily follows that the defendants would *"become the owners of such blocks;"* for if the defendants have abandoned the work, as the testimony shows, leaving that or any other number of Belgian blocks at the quarry, we do not see how they would become the owners of the same. On the contrary, if such is the case, we see no reason why the plaintiffs may not resume possession of the quarry, together with all the stone left there which had been taken out of the quarry and cut into Belgian blocks, and if so, then the plaintiffs have been benefited rather than injured thereby. But be all this as it may, we think that the parties having clearly expressed in writing the terms of the contract, which do not appear to us to be so unreasonable as to warrant a court in changing those terms, they must be held to the plain meaning of the terms they have used; and hence that the Circuit Judge erred in instructing the jury that whatever stone was quarried and ready for shipment may be regarded as shipped under the terms of this contract, and that defendants were liable to the plaintiffs for the contract price of the same.

It seems to us also that the second exception is well founded. Inasmuch as the contract prescribed one price for "dimension

stone," and another and much lower price for all other stone, it was, of course, very material to determine what was meant by the term "dimension stone," and especially whether Belgian blocks were embraced in that term. Now, as the term "dimension stone" was a term of art, it was competent, under the well settled rule, to receive evidence of experts as to the technical meaning of that term. 1 Greenl. Evid., sec. 280; 3 Am. & Eng. Encycl. L., 867–8, and notes. Accordingly such evidence was received in this case, and, as it was conflicting, a question of fact was presented as to the meaning of the term "dimension stone," and especially whether it included Belgian blocks, which it was the province of the jury to determine, and it was for the court to instruct them as to the proper construction of the contract, accordingly as they found one or the other meaning of the term to be correct.

It seems to us that the true rule upon this subject is well stated by Parke, B., in *Neilson* v. *Harford*, 8 Mees. & W., 806, in the following language, taken from one of the notes to the passage in the Encyclopedia above cited: "The construction of all written instruments belongs to the court alone, whose duty it is to construe all such instruments as soon as the true meaning of the words in which they are couched, and the surrounding circumstances, if any, have been ascertained as facts by the jury; and it is the duty of the jury to take the construction from the court either absolutely, if there be no words to be construed [or perhaps it would be better to say interpreted] as words of art or phrases used in commerce, and no surrounding circumstances to be ascertained; or conditionally when those words or circumstances are necessarily referred to them."

This rule was illustrated in the case of *Hutcheson* v. *Bowker*, 5 Mees. & W., 535, where an offer had been made by letter to sell a certain quantity of "good barley," and the letter in reply, after stating the offer, contained the following: "Of which offer we accept, expecting you to give us *fine* barley and good weight;" and it was held that although the jury might find the mercantile meaning of "good" and "fine" as applied to barley, yet they could not go further and find that the parties did not understand each other. The question whether there was a sufficient

7—34

acceptance was a question to be determined by the court upon a proper construction of the letters, Parke, B., saying: "The law I take to be this—that it is the duty of the court to construe all written instruments. If there are peculiar expressions used in them, which have in particular places or trades a known meaning attached to them, it is for the jury to say what is the meaning of such expressions, but for the court to decide what is the meaning of the contract." So, as was said by Shaw, C. J., in *Eaton* v. *Smith*, 20 Pick., 150 (quoting again from the Encyclopedia): "When a new and unusual word is used in a contract, or when a word is used in a technical or peculiar sense, as applicable to any trade or branch of business, or to any particular class of people, it is proper to receive evidence of usage to explain and illustrate it, and that evidence is to be considered by the jury; and the province of the court will then be to instruct the jury what will be the legal effect of the contract or instrument as they shall find the meaning of the word modified and explained by the usage."

It seems to us, therefore, that the Circuit Judge erred when he instructed the jury that while a Belgian block was not a dimension stone, if that word is to be interpreted in its technical sense, yet the question for the jury to determine in this case was whether the term "dimension stone" was used in this contract in its ordinary technical sense, or in some other sense. The written contract showed what terms had been used by the parties, and in view of the fact that one of those terms—"dimension stone"—was a term of art, the only question for the jury was, what was the meaning of that term in the art to which it is applied, and not whether the parties used that term in a sense different from that which it ordinarily bore. This would be allowing a party by parol evidence to prove that the understanding between the parties was different from that which the terms they have used ordinarily and properly import, which is not permissible, as it would be in effect varying the terms of a written contract by parol. See *DeCamps* v. *Carpin*, 19 S. C., 121. We must look alone to the written contract for the words used by the parties, and where some of the words are terms of art, it is for the jury to say, from the testimony adduced, what is the proper and technical

signification of such terms, and there the province of the jury terminates, and it is for the court to determine the true construction of the contract, reading the terms of art used therein in the sense as thus ascertained by the jury. But the jury are not at liberty to say that though the words used by the parties properly mean one thing, yet the evidence shows that the parties intended them to mean something else; for that would permit the jury to substitute for the words actually used by the parties other words which they have not used. In this case both of the parties who were active in making this contract were quarrymen, with considerable experience in the business, and when they used a term of art, it must be presumed that they used it in its technical sense, and as it would ordinarily be understood by quarrymen, and in the absence of anything in the contract itself indicating that they intended to use that term in any other or broader sense, this presumption is conclusive.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and the case be remanded to that court for a new trial.